KURN et al., Trustees, v. FREEMAN, Adm'r.

No. 29337. Feb. 18, 1941.

Rehearing Denied April 29, 1941.

Application for Leave to File Second Petition for Rehearing Denied May 20, 1941.

*113 P. 2d 194.*

J. W. Jamison, Cruce, Satterfield & Grigsby, and Ben Franklin, all of Oklahoma City, for plaintiffs in error.

Sigler & Jackson, Ogden & Thompson, and John M. Thompson, all of Ardmore, for defendant in error.

CORN, V. C. J. This is an action to recover damages for the wrongful death of deceased resulting from a collision with a train upon a railway crossing. The verdict and judgment were for plaintiff, and the defendants appealed. The parties are referred to herein as plaintiff and defendants, as they appeared in the trial court.

For reversal of said judgment, defendants' first proposition is as follows:

"The trial court erred in not setting aside the verdict and granting defendant a new trial when the record affirmatively showed that the verdict of the jury was based on perjured testimony which was not discovered by defendant until after the verdict had been returned."

After the trial one of plaintiff's witnesses made an affidavit that he testified falsely at the trial, and on hearing on motion to set aside the verdict and to grant a new trial, the witness testified he did not actually see the accident as testified at the trial, but he arrived at the scene of the accident shortly thereafter. The alleged perjured testimony was to the effect he saw deceased as he approached the crossing and deceased slowed down, then came to a stop or almost a stop before proceeding upon the track. The witness also made certain observations with reference to the obstructed view at this crossing which were not justified by the physical facts.

The above proposition rests solely upon the premise that the record affirmatively shows that the verdict was based on perjured testimony. A careful examination of the record does not justify such a conclusion. The trial court stated at the hearing on motion for new trial that he did not believe the witness and did not think the jury considered

his testimony in arriving at a verdict. The testimony of the witness was not the positive and reasonable kind that influences or convinces juries. His powers of observation and reasoning were manifestly dwarfed, immature, and deficient. The testimony given was improbable and absurd. The witness stated he saw the accident from a distance of a quarter of a mile away, and he saw the deceased slow down to ten or twelve miles per hour and come to a stop, or almost to a stop, before driving on the track, whereas the physical facts as shown by the testimony of reliable witnesses, by photographs, and as viewed by the jury itself, clearly reveal the scene of the accident is not visible at the point from which the witness claimed to have seen the accident, on account of obstructions along the east side of the railroad track. Moreover, his observations could not have been very reliable from that distance even if no obstructions had intervened to cut off the view. Equally absurd was his statement that one had to be within a foot of the track to see a train coming.

Wiley Dixon, manager of a lumber company, testified he saw the accident. He was 150 feet east of the crossing, was traveling south, and had come to about 50 feet of the corner where deceased turned off the highway on to the road crossing the track. He was driving a car and was traveling south on the highway, which parallels the railroad, and when he was about 280 feet north of the corner he saw deceased coming from the south and turn west to cross the track. The train was coming from the north at an estimated speed of 60 miles per hour. Deceased was traveling about 25 miles per hour as he approached the corner, and witness did not know whether he further reduced his speed. The train struck the car just as the front wheels reached the track and hurled it about 75 feet. The train went on about a quarter of a mile before stopping. He said the train whistled three or four blasts up the track about 600 feet before reaching the crossing.

Mrs. Dixon testified that she was riding in the car with her husband and they were traveling south upon the highway and she saw deceased coming north on the highway at 25 or 30 miles per hour, and saw him turn west to cross the track, but did not observe if he slacked his speed. She heard the train whistle about 800 feet up the track, but did not hear it whistle again until it hit the car.

Dorothy Alice Dixon, age 15, heard the whistle back up the track and saw the car of deceased coming from the south and turn west toward the crossing. She estimated the speed of the car at 25 miles per hour, but did not know whether or not it slowed down before reaching the crossing.

The fireman on the train testified that: The train was going about 55 miles per hour; he was sitting at his regular place on the left side of the train; when he first saw the car the train was about 300 feet from the crossing; the car was about 150 to 160 feet from the track, and was traveling about 25 miles per hour; he first saw the top of the car coming toward the track, and then as it came close to the track he could see the whole car. When he saw the car was not going to stop he yelled to the engineer to attract his attention, and to give him the violent stop signal. The engineer turned on the whistle and applied the brakes. He stated the embankment on the east side of the track permitted the view of only the top of the car at 150 feet away. The whistle was sounded a quarter of a mile up the track from the crossing, and the bell was ringing. The train was going slightly down grade, and after the emergency brakes were applied it went on about eleven telegraph poles beyond the crossing before stopping, the poles being about 150 feet apart.

The engineer testified that he gave the regulation crossing whistle a half mile back and continued it to the crossing; when the fireman yelled at him, he let loose the whistle cord and grabbed the brake and threw it into emergency; he was then about 300 feet from the cross-

ing, going at 55 miles per hour, and the train went eleven poles after he applied the brakes before it stopped. He said the poles were 275 to 300 feet apart; he had been engineer 47 years and was familiar with emergency stopping and considered it a good stop; he turned on the bell at Mill Creek and had not yet turned it off. He said it was a fast passenger train and was five or six minutes late, and was running down grade at that place.

Willie A. Burns, defendants' witness, testified that he lived 300 or 400 yards down the track from the crossing and he saw deceased drive by his gate at about 35 miles per hour; that he slowed his speed to ten or twelve miles per hour as he approached the crossing. He heard the whistle a quarter of a mile up the track from the crossing, but did not hear it again until after the train struck the car. The wind was blowing from the south. He said there was a blind space between the corner and the track where it is impossible to see the train approaching, but upon moving closer up to the track it can be seen better, and at 50 feet from the crossing one can see up the track a quarter of a mile or more.

The testimony of other witnesses who came to the scene after the accident occurred is merely cumulative and does not materially change the factual situation as testified to by the foregoing witnesses.

Defendants' exhibits C and D, photographs taken at 100 and 150 feet, respectively, from the crossing on the east side of the track from which deceased approached the crossing, show that the train emerges into view about 200 feet up the track; that is, the top of the train comes into view at these distances. Other photographs show that from a distance of 50 feet from the crossing the view is clear for a considerable distance up the track. The danger element enters the scene when the train is anywhere from 300 to 600 feet from the crossing at the time the car turns the corner from the highway to the crossing, and especially if the train is running at a high rate of speed and is not sounding the whistle as it traverses the obstructed area. This train was traveling about 100 feet per second and it comes into view only three or four seconds at most before reaching the crossing. This leaves little time for a car to stop after the train comes into view.

The jury was taken out to the scene of the accident and watched the same train pass over this crossing from the same direction as it did at the time of the accident. This demonstration no doubt formed the basis of their verdict as to the dangerous character of the crossing.

As to the question of negligence on the part of the defendants in the operation of the train at this crossing, and of contributory negligence on the part of deceased, the jury had to rely on the testimony of witnesses testifying at the trial. The fireman and engineer both fixed the speed of the train at 55 miles per hour, and other witnesses estimated it at 55 to 60 miles per hour. The train was going down grade at this point with resultant increase of momentum and decrease of operating noise. The speed and momentum were indicated by the distance the train traveled beyond the crossing before stopping, which was about a half mile. There is conflict in the testimony as to the sounding of the whistle. The fireman stated the whistle was sounded a quarter of a mile up the track and was again sounded within 300 feet of the crossing after they saw the car approaching the track. The engineer testified he gave the regulation crossing whistle a half mile back and continued it to the crossing. All the other witnesses corroborate the testimony of the fireman that the whistle sounded a quarter of a mile up the track and was not again sounded until the instant the accident occurred. Both the fireman and engineer testified the train was about 300 feet from the crossing when the top of the car first came in sight. The only witnesses testifying that the bell was ringing were the fireman and engineer. Whether the foregoing manner of operating the train at a dangerous crossing constituted negligence was a question of fact for the jury. All the witnesses were in agreement on the speed of deceased on the highway before turning, the estimate

being from 25 to 35 miles per hour. After turning, his speed was estimated at 25 miles per hour by the fireman, and at ten or twelve miles per hour by the witness Burns. Having traveled at the rate of 25 to 35 miles per hour upon the highway it is reasonable to conclude that he slowed down at the corner and approached the crossing at a speed somewhere between ten and 25 miles per hour as estimated by the witnesses making an estimate of his speed. Now, the further question arises: Did the approaching of this crossing at said speed where the view was thus restricted, and, in the absence of a danger alarm or signal sufficient to attract the attention of the deceased, his proceeding upon the crossing without stopping, constitute contributory negligence on the part of the deceased? This also was a question of fact for the jury to determine.

In view of the record we find no ground for the contention of the defendants that the record affirmatively shows that the verdict of the jury was based on the alleged perjured testimony of said witness. All facts about which said witness testified were the subject of inquiry covered by other witnesses, and the jury was properly instructed by the court that they were the sole judges of the facts proved and of the credibility of the witnesses and of the weight and value to be given their testimony.

The granting or denial of a motion for new trial is addressed to the sound legal discretion of the trial court, and in the absence of an abuse of discretion, the action of the trial court will not be reversed. Mitchell et al. v. Lehmer, Ex'r, 185 Okla. 530, 94 P. 2d 916; Yellow Cab Operating Co. v. McNamara, 173 Okla. 572, 49 P. 2d 563. In view of the evidence in this case, we are unable to say the trial court abused its discretion in the denial of the motion for new trial.

It is a well-settled rule that where there is any competent evidence reasonably tending to support the verdict of the jury, the same will not be disturbed on appeal.

As above indicated, we have examined the record and we find therein sufficient competent evidence to sustain the verdict. Verdict and judgment affirmed.

OSBORN, HURST, BAYLESS, and ARNOLD, JJ., concur. WELCH, C. J., and RILEY, GIBSON, and DAVISON, JJ., dissent.

———

WELCH, C. J. (dissenting). It is my view from the record that the trial court did abuse his discretion in denying the motion for a new trial. I am authorized to say that RILEY, GIBSON, and DAVISON, JJ., concur herein.